GARNAY, INC., Plaintiff,

v.

**M/V LINDO MAERSK, then known as McKinney Maersk, etc., her engines, boilers, etc., in rem,**

v.

**MAERSK LINES, Difko XLIII K/S + Kodif XIII APS and Bridge Terminal Transport in personam, Defendants and Third Party Plaintiff,**

v.

**CERTAIN UNDERWRITERS AT LLOYDS OF LONDON and various other underwriting companies in London, Third Party Defendants and Fourth Party Plaintiffs,**

v.

**The UNITED STATES of America, Fourth Party Defendant.**

No. 91 Civ. 3031 (CSH).

United States District Court, S.D. New York.

March 8, 1993.

Bigham Englar Jones & Houston by Lawrence B. Brennan, New York City, for Garnay, Inc.

Freehill Hogan & Mahar by Owen F. Duffy, New York City, for defendant and third-party plaintiffs Maersk Line, Inc., Difko XLIII K/S + Kodif XIII APS and Bridge Terminal Transport.

Caesar, Napoli & White by Mendel White, New York City, for Certain Underwriters at Lloyds of London, et al.

U.S. Dept. of Justice by Mark E. Schaefer, New York City, for the U.S.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This admiralty action involves alleged damage to a relatively exotic cargo, dried Gingko Biloba leaves (hereinafter "leaves"), the theft of a container, and the belated emergence on the scene of the Federal Bureau of Investigation. The action has metastasized into fourth-party practice, and is now before the Court on various motions and cross-motions.

### Background

Plaintiff Garnay, Inc. is a corporation with offices located at Sumter, South Carolina. Garnay contracted to sell a quantity of leaves from its 1989 harvest to Cara Partners of Cork, Republic of Ireland. To arrange for the carriage of the leaves from Sumter to Cork, Garnay contacted the Maersk Line Agency located at Mount Pleasant, South Carolina. Maersk Line Agency makes commercial arrangements on behalf of the various Danish corporations that own vessels bearing the Maersk name, whose worldwide operations take place under the trade name "Maersk Lines." Maersk Lines is named as a defendant in this case. So are Difko XLIII

K/S + Kodiff XIII Aps, the corporate owners of the M/V LINDO MAERSK, the vessel designated to perform the ocean carriage and the *in rem* defendant. At the pertinent times, the LINDO MAERSK was named the McKINNEY MAERSK.

The complaint also names as a defendant Bridge Terminal Transport ("BTT"). BTT is affiliated with Maersk Container Service, another Maersk Lines entity involved in ocean carriage.

Specifically, on October 24, 1989 Maersk Line Agency issued a "master work/delivery order" which indicated that on October 24, 1989, BTT would pick up at Garnay's Sumter facility three containers of leaves for delivery to Maersk Line at the Wando Terminal, Mount Pleasant, South Carolina, for loading on board the McKINNEY MAERSK, scheduled to depart Mount Pleasant on her transatlantic voyage on November 2, 1989.

A report dated October 31, 1989 from A.J. Lancaster, BTT's transport manager, to the Maersk Line Agency office in Mount Pleasant states that on October 24, 1989, a contract driver for BTT delivered to the BTT yard at Mount Pleasant a 40–foot container bearing number ITLU 5321620 which was said to contain 117 bales of leaves. This is one of the three containers of leaves that Garnay had sold to its Irish purchaser, and contracted with Maersk Lines to deliver. BTT intended to deliver the container to Maersk Lines at the Wando Terminal within the next few days. However, on October 26 the driver noticed that the container was missing. Efforts to track the container at other BTT terminals proved fruitless. On the morning of October 30, 1989, Lancaster reported the container as stolen to the county police. On October 31, 1989, the BTT risk management office advised Lancaster to report the loss to the Federal Bureau of Investigation. The transport manager's report dated October 31, 1989 concludes with this sentence: "I talked with agent Al Paltola and he is to get back with me later today."

As the result of the FBI's conduct in this case, the United States has been made a fourth-party defendant by underwriters of the liability risks of Maersk Lines and BTT. The Government moves to dismiss that fourth-party complaint and submits in its support an affidavit of Ronald L. Dick, an FBI agent in charge of the pertinent investigation. From that affidavit we learn that on October 31, 1989 BTT reported to the FBI that the container of leaves had been stolen. In point of fact, the FBI had purchased and received the container of leaves on or about October 26, 1989. The FBI purchased the stolen cargo as part of an undercover "sting" operation targeting, for the most part, automobile thefts in the area. The FBI kept the leaves, stored in the container, and said nothing to BTT about it. Agent Dick says in his affidavit: "The disclosure of its recovery was withheld from BTT as necessary to protect the integrity and security of the continuing investigation."

The undercover operation came to an end on June 17, 1991 after the local press revealed its existence. The FBI gave notice of the leaves' whereabouts to Garnay's underwriters' surveyor on June 26, 1991.

Reverting to events at the intended loading port of Mount Pleasant, when the vessel arrived only two of the three containers comprising Garnay's shipment of leaves to Cara Partners were on hand at the Maersk Lines facility, the third container having been stolen. The two remaining containers were loaded on board the vessel. Maersk Lines issued a "house to house" bill of lading covering two 40–foot containers "said to contain by shipper 230 bales dried Gingko Biloba leaves, 1989 crop." The bill of lading recites Sumter, South Carolina as the place of receipt and Cork as the place of delivery. The port of discharge from the vessel was Rotterdam, to be followed by further onward routing.

Thus the bill of lading covered the two containers that comprised part of Garnay's sale of leaves to Cara Partners. No bill of lading was issued with respect to the third, missing container.

As noted, the FBI advised cargo surveyors on June 26, 1991 that the FBI had the leaves. The container was moved from an FBI impoundment facility in Columbia, South Carolina, to the BTT terminal in Mount Pleasant. The container was opened. The report of the cargo surveyor, Jack Moore of the

firm of Toplis & Harding, recites that upon examination the leaves were found to be "in a dry and apparently normal condition," with a "light musty odor"; the leaves were medium brown in color "and crumbled easily when touched." Dr. Cecil Johnson, a representative of Garnay, attended the survey and advised that "although the goods appeared to be sound an exact determination of the condition of the goods would require a laboratory analysis." The surveyors representing all interests at the July 17, 1991 survey agreed that Johnson would send samples of the leaves for analysis in Ireland.

Garnay sent samples from twelve different bales to Cara Partners for analysis. The report of Dr. J. O'Reilly, the Quality Assurance Manager, for Cara Partners reads as follows:

> The leaves were green brown with a faint musty odor suggesting that the leaves were not stored under ideal conditions. The average percentage dry extract for the 12 bales was 29.27% which is 17.0% lower than the 35.28% obtained for the average percentage dry extract for leaves from Garnay in 1989. Similarly, the percentage heterosides is lower by 6.8%. The percentage terpenes is higher by 3.3% than the average crop in 1989 from Garnay.
>
> Cara Partners operates to GMP procedures, which requires that we have control of raw materials from time of harvesting to processing. In this situation we did not have this control. Also, while the percentage terpenes in the stolen container is similar to the crop average, there is a very significant decrease in the percentage dry extract which is most unusual. Bearing this in mind and more importantly the fact that we did not have control of the raw materials, I recommend that these leaves should not be used for the production of Ginkgo Biloba extract."

Cara Partners having refused to accept the leaves, they were sold at auction by Toplis & Harding at Charleston, South Carolina on November 12, 1991. The salvage proceeds were $2,151.19. Garnay and its underwriters allege that they incurred survey fees of $1,203.00 for the investigation of the loss and the salvage sale. Garnay bases its claim upon the CIF value of the leaves as evidenced by the invoice. That CIF value is $81,950.00, from which Garnay deducts the salvage proceeds of $2,151.19, but adds in the survey fees of $1,203.00, for a net damage claim of $81,001.81.

After Garnay filed its complaint against the vessel, Maersk Lines, and BTT, those defendants tendered the defense to their liability underwriters, who declined coverage for reasons that the present record does not reveal. Accordingly, Maersk Lines and BTT filed a third-party complaint against those liability underwriters, generically referred to as "certain underwriters at Lloyds of London and various other underwriting companies in London." Those third-party defendants brought a fourth-party complaint against the United States because of the activities of the FBI. The various parties defendant assert appropriate cross-claims against each other.

Garnay now moves for summary judgment against the vessel, Maersk Lines, and BTT or, in the alternative, for an order under Rule 14(a), Fed.R.Civ.P., severing its action against these defendants from the third-party and fourth-party actions.

Maersk Lines and BTT oppose Garnay's motions for summary judgment and to sever, and cross-move for summary judgment dismissing the complaint or, in the alternative, for partial summary judgment limiting the amount of Garnay's damages to a package limitation amount of $500 per bale of leaves.

The United States moves under Rule 12(b)(1) and 12(b)(6) to dismiss the fourth-party complaint, or in the alternative for summary judgment under Rule 56.

### Discussion

■ Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leath-*

erware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir.1991) (citing *Knight v. U.S. Fire Insurance,* 804 F.2d 9 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)) (citation omitted). The responding party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' ... or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citations omitted). While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### The Garnay and Maersk/BTT Motions

The cross-motions between Garnay as shipper of the cargo and Maersk Lines/BTT pose a threshhold issue as to the nature of the relationship between them.

Garnay claims that these defendants are liable for the non-delivery of and damage to the leaves as bailees under South Carolina law. Garnay stresses that Maersk Lines did not issue a bill of lading with respect to the stolen container and its contents.

Maersk Lines and BTT contend that, as the result of prior dealings between the parties, the contract of carriage embodied in the Maersk Lines bill of lading should be extended to the stolen container, so that the rights and obligations of the parties are governed by the Carriage of Goods by Sea Act, 46 U.S.C. App. §§ 1300 *et seq.* ("COGSA"). Those limitations on liability extend to BTT, it is argued, by virtue of the "Himalaya" clause in the bill of lading.

Garnay responds that the vessel and Maersk Lines are liable even if COGSA applies; and that the Maersk Lines bill of lading was not drafted in a form sufficient to extend COGSA coverage to BTT.

Maersk Lines and BTT both claim the benefit of the COGSA limitations on liability. COGSA applies *ex proprio vigore* to the vessel and her owners, since the ocean leg of the carriage was from a United States port in foreign trade. 46 U.S.C. App. § 1300. But BTT is not a "carrier" under COGSA. *See* 46 U.S.C. App. § 1301(a). Accordingly, BTT's common law liability for damages is not limited by COGSA, *see Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 308, 79 S.Ct. 766, 772, 3 L.Ed.2d 820 (1959), unless the parties to the contract, including Garnay, expressed an intention to extend the statute's benefits to BTT.

Parties to a bill of lading are entitled in law to extend contractual COGSA liability protection to third parties that would not otherwise fall within the scope of the statute. *See, e.g., Toyomenka, Inc. v. S.S. Tosaharu Maru,* 523 F.2d 518, 520 (2d Cir. 1975) ("It is axiomatic that parties to a bill of lading may extend the $500 limitation of liability to third parties."). The provision in a bill of lading purporting to achieve that purpose is commonly referred to as a "Himalaya" clause in memory of the English case of *Adler v. Dickson,* 1 Q.B. 158 (1955), involving a steamship called the "Himalaya." *See Brown & Root, Inc. v. M/V Peisander,* 648 F.2d 415, 417 n. 5 (5th Cir.1981) (discussing *Adler*). "A bill of lading containing such a limitation will be strictly construed against the parties whom it is claimed to benefit." *Toyomenka* 523 F.2d at 521. The issue is the parties' contractual intentions. If the Himalaya clause in the bill of lading is ambiguous as to the parties covered, disputed questions regarding the parties' intentions ordinarily should not be adjudicated on a motion for summary judgment based on affidavits and depositions, but rather should await trial. *See Lucky–Goldstar v. S.S. California Mercury,* 750 F.Supp. 141, 145 (S.D.N.Y.1990), and cases cited.

In the case at bar, Garnay stresses that no bill of lading was issued with respect to the container in question. Maersk Lines and BTT rely upon a series of cases holding that, in the circumstances presented, the parties were bound by an ocean bill of lading,

even though none had been issued at the time the cargo was damaged or lost. *See Luckenbach S.S. Co., Inc. v. American Mills Co.,* 24 F.2d 704 (5th Cir.1928); *Mack Trucks, Inc. v. Farrell Lines, Inc.,* 1990 A.M.C. 2669, 1990 WL 3926 (S.D.N.Y.1990); *Berkshire Knitting Mills v. Moore–McCormack Lines, Inc.,* 265 F.Supp. 846 (S.D.N.Y. 1965).

In *Luckenbach,* a shipment of cots was delivered to the loading wharf at the ocean carrier's request. A portion of the shipment was destroyed by fire on the wharf. The bill of lading, issued after the fire, contained a clause exempting the carrier from liability for loss by fire, and excluded the cots so lost. It was the standard bill of lading used by the carrier.

The cargo shipper argued that in the absence of a bill of lading covering the lost goods, the ocean carrier's liability was that of an insurer. The Fifth Circuit rejected that contention, stating at 705:

> Appellant [the carrier] was required by law to issue a bill of lading, but it had the right to except liability for loss by fire.... Appellee [the cargo shipper] is presumed to know the law, and therefore must have known that the terms and conditions on which its goods were received and would be transported would be contained in a bill of lading to be issued later. In the circumstances, it cannot be inferred that it was the intention of the parties to enter into a contract that would bind the carrier as insurer; but an implied understanding arose from the common business experience that the carrier would issue such bill of lading as it was its custom to issue to shippers in the usual course of its business.

In *Mack Trucks* and *Berkshire Knitting Mills,* this court dealt with cases of preloading cargo damage occurring on the ocean carrier's pier before the issuance of a bill of lading. In both cases, the carrier's agent had issued a dock receipt incorporating by reference the terms, conditions and exceptions of the carrier's bill of lading. There is no comparable document in the case at bar, and so to that extent the cases are inapposite. In *Berkshire Knitting Mills,* Judge

Palmieri went on to say at 265 F.Supp. at 848:

> And even had there been no dock receipt, the clear intention of the parties to be bound by the respondent's bill of lading form, even though later issued, was sufficient to require application of the limitation provisions. In *Luckenbach S. S. Co. v. American Mills Co.,* 24 F.2d [at] 705 (5th Cir.1928), the parties were held bound by the terms of a bill of lading in customary form, though no paper at all was issued by the carrier except a memorandum acknowledging receipt of the goods to be shipped.

These cases, which deal only with ocean carriers, are of more assistance to the vessel and Maersk Lines than to BTT, a third party who may benefit from the bill of lading/COGSA terms, conditions and exceptions only if Garnay unambiguously agreed to that extension. None of the cases defendants cite involved the applicability of a Himalaya clause.

Garnay is charged with knowledge that Maersk Lines was required by law to issue a bill of lading "or similar document of title" evidencing a contract for the carriage of goods by sea, 46 U.S.C. App. § 1300, and that certain limitations of liability were available to the carrier. Accordingly the rationale of the Fifth Circuit in *Luckenbach,* followed by this court in *Berkshire Knitting Mills* and with which I agree, makes the bill of lading issued with respect to the two surviving containers binding between Garnay, the vessel and the ocean carrier with respect to the contents of the lost container as well, provided that the bill of lading in evidence was the standard form bill of lading that Maersk Lines always used. That seems a fair inference, but it is not sufficiently established by the present record. It is significant to note in that regard that there has been little discovery in the case to date. The defendants' affidavits do not explicitly state that the bill of lading in evidence was Maersk's standard form.

■ As for prior commercial relations with Garnay, the defendants' affidavits say only that during 1989 Garnay contracted with the Maersk Lines agency at Mt. Pleasant, South Carolina "on several occasions" to ship cargoes of leaves from Sumter, South Carolina

to Ireland aboard Maersk Lines vessels. No copies of the prior bills of lading are attached to the motion papers. A more complete evidentiary record must be developed before the court is in a position to determine whether or not Garnay should be regarded as having agreed, through prior practice, to the extension of COGSA to BTT by means of the Himalaya clause that appears in the bill of lading presently in evidence.

The Himalaya clause in that bill of lading provides in ¶ 3(2) that the COGSA limitations and exonerations from liability extend to "any servant, agent, stevedore or sub-contractor of the Carrier...." Defendants say that given the relationship between BTT and Maersk Lines, the clause unambiguously refers to BTT. Garnay says the language is ambiguous, and if Maersk Lines intended to include an "inland carrier" such as BTT in the clause, it should have said so specifically, citing *Lucky–Goldstar, supra,* among other authorities.

Since a more complete evidentiary record must be developed to determine whether or not the Himalaya clause is a part of the contract between the parties, I defer judgment on the meaning of the clause, and will allow further exploration by discovery on that issue as well. *See Citrus Marketing Board of Israel v. J. Lauritzen A/S,* 943 F.2d 220, 223 (2d Cir.1991).

It follows from the foregoing that the motion for summary judgment on behalf of Maersk Lines and BTT must be denied.

■ I also deny plaintiff Garnay's motion for summary judgment. Accepting *arguendo* Garnay's contention that BTT's liability is that of a bailee under South Carolina law, a bailee is not liable if he sustains the burden of proving due or ordinary care on his part. *See Industrial Welding Supplies, Inc. v. Atlas Vending Co., Inc.,* 276 S.C. 196, 277 S.E.2d 885 (1981). All the present sketchy record reveals is that the container was stolen from BTT's lot. BTT, assuming it is properly cast as a bailee, is entitled to prove that it exercised reasonable care in guarding against theft. That issue is not appropriate for summary disposition, at least on the present record.

Assuming that COGSA principles apply to these defendants, questions of fact exist with respect to the condition of the cargo upon delivery to defendants, and its condition upon eventual recovery, with particular reference to why Cara Partners refused to accept the leaves.

■ Garnay contends that viewing the case in a COGSA context, it has established a prima facie case. Generally, that requires proof of delivery of the goods to the carrier in good condition and outturn of the goods by the carrier in a damaged condition. In the case at bar, the leaves constituted a perishable commodity, and their internal condition was not revealed to the carrier, the bales having been placed into the container by the shipper at the inland point of loading. In these circumstances, the shipper must go beyond a clean bill of lading, and prove actual condition of the goods at the time they were delivered to the carrier. *See, e.g., Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 353 (2d Cir.1981).

Garnay has not yet made that showing. The certificate Garnay issued on October 17, 1989 with respect to these 117 bales of leaves gives particulars only with respect to the weight of the bales. The certificate does recite that the leaves were harvested during the 1989 crop, but there is no specific reference to the leaves' internal condition. Perhaps this sort of certificate is sufficient to establish actual good condition of leaves such as these, but I cannot make that determination on the present record.

■ As for the leaves' condition when recovered by Garnay from the FBI, the Cara Partners survey appears to specify as the primary reason why the leaves were rejected the fact that Cara Partners "did not have control of the raw materials from time of harvesting to processing." Arguably that is not a cause related to the physical condition of the leaves, so that the second prong of a prima facie case is not made out. To be sure, the Cara Partners survey also says "there is a very significant decrease in the percentage dry extract which is most unusual." The question is whether the physical condition of the leaves, standing alone, was

sufficient to cause their rejection by the consignee. This may be further explored in discovery.

For these reasons, plaintiffs' motion for summary judgment fails as well.

### The Motion of the United States

The United States as a sovereign nation is immune from suit unless that immunity has been waived by statute.

 In this court, the third-party defendants and forth-party plaintiffs assert jurisdiction over the government pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 ("FTCA"). The FTCA provides generally that the United States shall be liable, to the same extent as a private party, "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment." § 1346(b). However, that broad waiver of sovereign immunity is subject to specified exceptions. § 2680(a)–(f), (h)-(n). One of those exceptions, § 2680(c), provides that § 1346(b) shall not apply to

> Any claim arising in respect of ... the detention of any goods or merchandise by any officer of customs or excise or any other law-enforcement officer.

In *Kosak v. United States*, 465 U.S. 848, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984), the Court held that § 2680(c) precluded recovery from the United States in tort for injury to private property sustained during a temporary detention of the property by the Customs Service. The plaintiff, a serviceman transferred from Guam to Philadelphia, brought his collection of oriental art with him. The Customs Service seized the art collection but returned the objects to plaintiff after various legal issues were resolved in plaintiff's favor. Plaintiff then filed an action under the FTCA, alleging "that some of the objects returned to him had been injured while in the custody of the Customs Service." 465 U.S. at 850, 104 S.Ct. at 1521. The Court held that § 2680(c) barred "suits alleging that customs officials injured property that had been detained by the Customs Service," *id.* at 862, 104 S.Ct. at 1528, accepting

the government's argument that the § 2680(c) exception covered "all injuries to property sustained during its detention by customs officials." *Id.* at 853, 104 S.Ct. at 1523 (footnote omitted).

Because *Kosak* involved the conduct of customs officers, the Court found it unnecessary to decide what kinds of law-enforcement officers other than customs officials are covered by the exception. *Id.* at 852 n. 6, 104 S.Ct. at 1522 n. 6.

The Supreme Court's opinion in *Kosak* specifically rejects the Second Circuit's rationale and holding in *Alliance Assurance Co. v. United States*, 252 F.2d 529 (2d Cir.1958). In *Alliance*, the Second Circuit held that § 2680(c) did not bar a claim against the government in tort arising out of the disappearance of plaintiff's goods from the Public Stores maintained by the Customs Service for inspection of incoming goods. The Second Circuit reasoned:

> That the exception does not and was not intended to bar actions based on the negligent destruction, injury or loss of goods in the possession or control of the customs authorities is best illustrated by the fact that the exception immediately preceding it expressly bars actions "arising out of the loss, miscarriage, or negligent transmission" of mail. 28 U.S.C.A. § 2680(b). If Congress had similarly wished to bar actions based on the negligent loss of goods which governmental agencies other than the postal system undertook to handle, the exception in 28 U.S.C.A. § 2680(b) shows that it would have been equal to the task. The conclusion is inescapable that it did not choose to bestow upon all such agencies general absolution from carelessness in handling property belonging to others.

252 F.2d at 534.

In *Kosak* the Supreme Court singled out that language for a critical dissection:

> We find the conclusion reached by petitioner and the Second Circuit far from "inescapable." The specificity of § 2680(b), in contrast with the generality of § 2680(c), suggests, if anything that Congress intended the former to be *less* encompassing

than the latter. The motivation for such an intent is not hard to find.

465 U.S. at 855, 104 S.Ct. at 1524 (emphasis in original).

In these circumstances, it is surprising to find the Second Circuit quoting the same language from *Alliance* in support of its conclusion in *Mora v. United States,* 955 F.2d 156, 160 (2d Cir.1992), that § 2680(c) did not apply to a tort claim brought by a prisoner who complained that the Drug Enforcement Agency had lost personal property seized when he was arrested. *Mora* quotes the discredited language from the *Alliance* but does not even mention *Kosak.*

However one may explain the mystery of *Mora,* I am bound by *Kosak,* and conclude that if the agents of the FBI are "law enforcement officer[s]" within the meaning of 2680(c), that section bars the asserted claim in tort for damage to the leaves during the FBI's sting operation-related detention of the leaves.

On that remaining issue, it seems clear that FBI agents are law-enforcement officers within the statute. If they are not, it is difficult to imagine who is. In *Mora* the Second Circuit assumed without discussion that DEA agents fell within § 2680(d). The Fifth Circuit held that Secret Service Agents fell within the statute in *A–Mark, Inc. v. United States Secret Service,* 593 F.2d 849 (9th Cir.1978). In *Sterling v. United States,* 749 F.Supp. 1202 (E.D.N.Y.1990), District Judge Spatt confirmed the comprehensive report of Magistrate Amon (as she then was) which extended § 2680(c) to DEA Agents who seized cash from plaintiff pursuant to 21 U.S.C. § 881(a)(6). After a review of the authorities, Judge Amon noted that "all circuits that have addressed the question have applied the exception broadly to include a variety of governmental seizures unrelated to customs activities," citing particularly *United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481, 1490–91 (10th Cir.), *cert. denied,* 469 U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984) (applying the exception to the seizure of adulterated beef by officials of the U.S. Department of Agriculture pursuant to the Meat Inspection Act). In *Sterling* Judge Spatt and Judge Amon filled the gap left by the Second Circuit in *Formula One Motors, Ltd. v. United States,* 777 F.2d 822, 823–24 (2d Cir.1985), in which the court applied § 2680(c) to the seizure of an imported automobile by DEA agents who were searching for smuggled narcotics. The Second Circuit regarded the phrase "other law-enforcement officer" as somewhat ambiguous, but reasoned that it at least applied to federal officers engaged in conduct "sufficiently akin to the functions carried out by customs officials" such as the seizure of an automobile still in transit from overseas. 777 F.2d at 823–24. I think that *Sterling* properly extended the application of the exception.

For these reasons, there is no cognizable claim in tort against the United States for the conduct of the FBI.

■ Fourth-party plaintiffs, supported by the defendants, also argue that jurisdiction in this court exists under the Tucker Act, 28 U.S.C. § 1346(a)(2). Brief at 12. Their theory is that the FBI's conduct gives rise to an implied contract of bailment. There is no substance to this jurisdictional contention. § 1346(a)(2) gives the district courts original jurisdiction, concurrent with the United States Claims Court, of, *inter alia,* a civil action "upon any express or implied contract with the United States ... not exceeding $10,000 in amount...." The claim at bar exceeds that amount. Claims against the United States for unlimited damages arising out of "any express or implied contract with the United States" fall within the exclusive jurisdiction of the United States Claims Court. *See* 28 U.S.C. § 1491(a)(1).

While the briefs of counsel debate the merits of the implied contractual claim, I do not reach the merits because, under the statutory scheme, this court has no subject matter jurisdiction over it.

For the foregoing reasons, the government's motion to dismiss the fourth-party complaint will be granted. I grant the motion under Rule 12(b)(1).

## CONCLUSION

The motion and cross-motion of plaintiff and defendants for summary judgment are denied.

898

The motion of the United States to dismiss the fourth-party complaint is granted. There being no just reason for delay, the Clerk is directed to enter judgment at this time dismissing the fourth-party complaint with prejudice. *See* Rule 54(b), Fed.R.Civ.P.

The remaining parties are directed to proceed with pre-trial discovery. The Court directs that discovery be completed on or before June 30, 1993. Any application to extend that time must be in writing and received by the court not later than ten days before the expiration date.

I defer at the present time decision on plaintiff's motion to sever the issues under Rule 42(a). I will consider that matter further at the next status conference before the court, which will be held in Room 307 at 2:00 p.m. on July 9, 1993.

The foregoing is SO ORDERED.