**AISIN SEIKI CO. LTD. and Aisin World Corp. of America, Plaintiffs,**

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant.**

No. 01 Civ. 4202(AGS).

United States District Court, S.D. New York.

Nov. 26, 2002.

Robert J. Phillips, Bigham Englar Jones & Houston, New York City, for Plaintiffs.

Barry N. Gutterman Ilene J. Feldman, Barry N. Gutterman & Associates, New York City, for Defendant.

## MEMORANDUM ORDER

SCHWARTZ, District Judge.

Plaintiffs in this action allege negligence and conversion arising out of defendant's handling of a shipment of automobile parts. Currently before the Court is defendant Union Pacific Railroad Company's ("UP's") motion, pursuant to Fed.R.Civ.P. 56, for partial summary judgment. Specifically, defendant UP seeks an order limiting plaintiffs' recovery in this action to $10,500. For the reasons set forth below, UP's motion is granted.

### Background

*The Parties*

Plaintiff Aisin Seiki Co. Ltd. ("Aisin Seiki") is "a legal entity with a principal place of business in Kariya City, Japan." (Complaint ¶ 2). Plaintiff Aisin World Corp. of America ("Aisin World") is "a corporation with a principal place of business in Torrance, California." (*Id.* ¶ 3). Defendant UP is "a rail carrier with offices and places of business in Omaha, Nebraska and Palestine, Texas." (Answer ¶ 4).

*The Facts* [1]

■ On May 23, 2000, Aisin Seiki sold a parcel of automobile parts, with an alleged value of $234,000, to Aisin World. (Complaint ¶¶ 5–6). Plaintiffs hired Kawasaki Kisen Kaisha, Ltd. ("K" Line) to transport the automobile parts from Nagoya, Japan to Detroit, Michigan, pursuant to a bill of lading issued by "K" Line on May 31, 2000. (Defendant's Statement Pursuant to Local Rule 56.1 ("Def.56.1") ¶¶ 1, 10). On the bill of lading, the shipment is described as containing 21 packages.[2] No declared value of any of the packages, or for the shipment as a whole, was inserted in the bill of lading. (Defs. 56.1 ¶ 7; Declaration of Terry Sheldon, Exh. A).

On or about May 31, 2000, the parts were loaded aboard the M/V Akashi Bridge, which sailed from Nagoya to Long Beach, California. (Complaint ¶ 7). At Long Beach, the shipment was delivered to defendant UP, which had been hired by

---

1. Under Local Civil Rule 56.1(c) a party opposing a motion for summary judgment must submit a "short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." The Local Rules also require that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Rule 56.1(d); see also Individual Rules of Practice of Allen G. Schwartz, United States District Judge, § IV.A. The 56.1 Statement submitted by plaintiffs on the instant motion contains no citations to evidence in the record, nor does it specifically identify the numbered factual assertions in defendant's 56.1 statement that are in dispute. Accordingly, the Court rejects plaintiffs' 56.1 statement, although it does consider the evidence attached to plaintiffs' "Notice of Opposition," submitted on May 6, 2002.

2. Defendant supports its factual assertion about the number of packages in the shipment by citing the Declaration of Terry Sheldon, an employee of defendant UP. (Def. 56.1 ¶ 3). Sheldon's declaration, however, states that the shipment contained 22 packages, not 21. (Sheldon Decl. ¶ 6). The bill of lading itself (Sheldon Decl., Exh. A), and plaintiffs' response to defendant's request for admissions (Declaration of Ilene J. Feldman, Exh. B ¶ 3), both indicate that there were 21 packages in the shipment. Given the fact that plaintiff does not dispute the number of packages (even in its non-compliant 56.1 statement (see n. 1, *supra*)), the Court accepts defendant's representation that the correct number of packages is 21.

Rail Bridge Corporation ("RBC"), a division of "K" Line's American affiliate, to transport the automobile parts by rail and deliver them to Aisin World in Detroit. (Complaint ¶¶ 7,8; Def. 56.1 ¶ 1). On or about June 12, 2000, the train on which the shipment was traveling derailed at Casa Grande, Arizona. (Complaint ¶ 9; Affidavit of K. Nguyen ¶ 9; Letter of Victor Thibeault at 1). Defendant UP determined that the contents were "a total loss" and disposed of the contents. (Sheldon Decl. ¶¶ 11, 13; Nguyen Aff. ¶ 11).

Plaintiffs contend that UP's determination that the shipment was a total loss was inaccurate. (Nguyen Aff. ¶ 14). Plaintiffs also maintain that neither plaintiffs nor "K" Line was given an adequate opportunity to contest UP's determination or attempt to salvage any usable merchandise from the derailed train. (Pl. Memorandum of Law in Opposition to the Motion at 6–7). Defendant maintains that "K" Line representatives attended the scene of the train derailment and did not take exception to UP's determination that the contents of the container were a total loss. (Def. 56.1 ¶¶ 15–16). Defendant also asserts that "K" Line did not contest UP's decision to dispose of the shipment's contents. (Sheldon Decl. ¶ 14). While there is some disagreement as to what exactly happened to the auto parts at issue, it is undisputed that none of the 21 packages were delivered to Aisin World in Detroit.

*The Bill of Lading*

Several clauses of the "K" Line bill of lading are pertinent here. Clause 1 defines the "Carrier" as "K" Line, and "Connecting Carriers" as parties "contracted by or acting on behalf of ["K" Line], participating in the transport of goods by land, water, or air under this Bill of Lading." (Sheldon Decl., Exh. B at 1). Clause 1 also defines the term "Sub–Contractor" to include "stevedores, longshoremen, terminal operators, warehousemen, watchmen, any Connecting Carrier, and any person, firm, corporation, or other legal entity, who or which performs services incidental to the transport of Goods under this Bill of Lading and their servants, agents and independent contractors." (*Id.*).

Clause 4, entitled "Responsibility For Shipments To, From Or Through U.S. Territories", states that:

> With respect to Goods shipped to, from, or through U.S. Territories, Carrier's responsibilities during the entire period (and not just during Water Carriage) from the time of receipt of Goods to the time of delivery of Goods shall be governed by the United States Carriage of Goods by Sea Act (U.S. COGSA) and U.S. COGSA shall be incorporated herein during the entire aforesaid period.... Also, if U.S. COGSA so applies, in no event shall Carrier be or become liable for any loss or damage to or in connection with the transport of Goods in an amount exceeding US$500 per package ... unless the nature and value of such have been declared by the shipper before receipt of Goods by Carrier and inserted in this Bill of Lading. (*Id.* at 4).

■ Clause 5 of the bill of lading is a "Himalaya" clause, which extends the bill's protections to sub-contractors.[3] It states

---

**3.** The term "Himalaya Clause" is derived from an English case involving a steamship named "Himalaya." *See Adler v. Dickson,* 1 Q.B. 158 (1955). A Himalaya clause is strictly construed against the party whom it is claimed to benefit. *See Toyomenka, Inc. v. S.S. Tosaharu Maru,* 523 F.2d 518, 520–21 (2d Cir.1975). The meaning and extent of the clause is determined by the intentions of the parties to the contract. *See Garnay, Inc. v. M/V Lindo Maersk,* 816 F.Supp. 888, 893 (S.D.N.Y.1993).

that sub-contractors and connecting carriers

shall be express beneficiaries under this Bill of Lading and shall have the benefit of all rights, defenses, exemptions from or limitations of liability, and immunities of whatsoever nature to which Carrier is entitled under the provisions of this Bill of Lading or by law, so that in no circumstances shall any [Connecting Carriers] be under a liability in contract or in tort greater than Carrier. (*Id.* at 5).

**Legal Standard**

■ A court may grant summary judgment only if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, which may be satisfied if it can point to the absence of evidence necessary to support an essential element of the non-moving party's claim. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat the motion for summary judgment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *See Ortiz v. Makram*, No. 96 Civ. 3285(AGS), 2000 WL 1876667, at *4 (S.D.N.Y. Dec. 21, 2000). "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996). All reasonable inferences and ambiguities are resolved in favor of the party against whom summary judgment is sought. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). The court's function on a motion for summary judgment is not to weigh the evidence, but to determine if there is an issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. There is an issue for trial if the party opposing summary judgment offers sufficient evidence for that party to obtain a favorable jury verdict at trial. *See id.* Summary judgment is proper when reasonable minds could not differ as to the import of the proffered evidence. *See Id.* at 250–52, 106 S.Ct. 2505; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).

**Discussion**

■ As an initial matter, the Court notes that the provisions of COGSA govern the shipment of goods from foreign ports to the United States and expressly provide for a $500 per package liability limitation. COGSA covers "the period from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C.App. § 1301(e). However, the provisions of COGSA may contractually be extended past the time of discharge of the cargo from the ship. *See Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 315 (2d Cir.1983). It is also well-settled that the protections of COGSA and other provisions of the bill of lading may contractually be extended to third party agents of the carrier, such as inland carriers. *See, e.g., Lucky–Goldstar v. S.S. California Mercury*, 750 F.Supp. 141 (S.D.N.Y.1990) (citing cases); *see also Seguros Illimani S.A. v. M/V POPI P*, 929 F.2d 89, 93 (2d Cir.1991) (extension of bill of lading protections to stevedores upheld); *Toyomenka, Inc. v. S.S. Tosaharu Maru*, 523 F.2d 518, 520 (2d Cir.1975) ("It is axiomatic that parties to a bill of lading

may extend the $500 limitation of liability to third parties."). However, as plaintiffs point out, when a Himalaya clause extends COGSA beyond the point of discharge from a particular ship, the provisions of the Act function purely as contractual terms, and not by force of law. *See Colgate Palmolive*, 724 F.2d at 315.

Here it is clear that the provisions of COGSA applied to defendant UP's rail carriage of plaintiffs' goods. Clause 4 of the bill of lading states that COGSA shall govern the responsibilities of the carrier (i.e. "K" Line) during the "entire period" of shipment—not just during the "Water Carriage." (Sheldon Decl., Exh. B at 4). Clause 4 also states that the carrier shall not be liable for any loss exceeding $500 per package unless a higher value for the goods being shipped is declared by the shipper and inserted in the bill of lading before the carrier receives the goods. (*Id.*). Under Clause 5 (i.e. the Himalaya clause), defendant UP, as a "connecting carrier," is entitled to "the benefit of all rights, defenses, exemptions from or limitations of liability . . . to which Carrier is entitled under the provisions of this Bill of Lading or by law, so that in no circumstances shall . . . [it] be under a liability in contract or in tort greater than Carrier." (*Id.* at 5). The meaning of such language is clear: Because plaintiffs did not declare that any of the packages being shipped had a value greater than $500, the liability limitation that is part of COGSA—and is also expressly reiterated in Clause 4 of the bill of lading—applies to claims by plaintiffs against defendant UP.

Plaintiffs recognize that the liability limitation of COGSA can be extended to rail carriers like defendant UP. However, plaintiffs argue that the liability limitation should not apply here because the limitation functioned as a contract term—not by force of law—and the contract at issue was automatically terminated when UP allegedly disposed of plaintiffs' goods without properly consulting plaintiffs. (See Pl. Memorandum in Opposition to the Motion at 12–13). Plaintiffs' argument is not supported by the existence of any express default or termination clause in the bill of lading, nor do plaintiffs cite case law to support their contention that UP's alleged conduct terminated the shipping contract. Accordingly, the Court finds that plaintiffs' claims, which arise out of the performance of duties contemplated by the bill of lading, are subject to the liability limitation contained therein.[4]

## Conclusion

For the reasons set forth above, defendant UP's motion for partial summary judgment is granted. Plaintiffs' potential recovery in this action is limited to $10,500.

**SO ORDERED**.

---

4.  The issue of whether all of plaintiffs' cargo was irrevocably damaged as a result of the derailment, though it poses a question of fact, does not preclude the granting of UP's motion for partial summary judgment. Even if UP's determination that the shipment was a "total loss" was inaccurate, the bill of lading would still limit plaintiffs' recovery to $500 per package, or a total of $10,500.